May it please the Court, Steve Goon for Appellant Delbert Dimick. The Court found that Mr. Dimick was a fully vested shareholder of PolyScan Inc. of a 12 percent interest, and that those shares were both converted, and that Mr. Donahue, the defendant, breached his fiduciary duty in doing so. The issue here is the District Court's error in calculating damages and failing to apply controlling Supreme Court precedent in California in Amundsen on when to value the shares. In Amundsen, the Court recognized that at plaintiff's election, the shares are to be valued on the date of breach or the date of the filing of the action. The Amundsen Court recognized that the plaintiff's claim that he had a controlled block issue in the appraisal method didn't produce compensation here. Dimick got compensation. The ---- Well, in Amundsen, it was a demer case where the Court said if it is found that you've been deprived of the opportunity to alienate your shares at trial, this is how the Supreme Court is instructing the lower court to calculate damages. The issue that we're really confronted with is one of speculation, because we know in Amundsen, the Court is telling us where a shareholder is deprived of his opportunity to transact the shares. We don't know when he would have sold. In Amundsen, we were deprived of that opportunity because the shares were made unsaleable by virtue of creating a separate corporation with a control block that made the minority shares essentially unsaleable. In this case, Mr. Dimick's shares were made unsaleable by virtue of Mr. Donohue's conversion of those shares. We don't know when Mr. Dimick would have sold because for two reasons. One, he didn't have the shares, and two, he didn't know they'd been converted. The district court found that he neither knew or had any reason to know that his shares had been taken from him. And that's why the district court used the date of the earlier date, because to do otherwise would be speculative. And the Amundsen court addressed exactly that concern. In Amundsen, the court said, since the damages is real, although the amount is speculative, equity demands that the minority shareholders be placed in a position at least as favorable as that of the majority. There's a long line of cases that discuss what do we do where the breaching fiduciary creates uncertainty by depriving the plaintiff of his shares. And in that setting, that uncertainty must fall on the breaching fiduciary. The wrongdoer has created the uncertainty. In this case, not only does the court's award not place Mr. Dimick in as good a position as Mr. Donohue, in fact, it puts him in a worse position because the 12 percent shares that Mr. Dimick had increased Mr. Donohue's shares. In fact, Mr. Dimick's 12 percent shares got essentially redistributed to the rest of the shareholders, and they all got the benefit. Here, Mr. Donohue, the record shows, sold his shares for $6 million. And if you take 12 percent of that, Mr. Donohue is unjustly enriched $700,000 by the court. That's all the shares? That was all Mr. Donohue's shares. Were there other minority, did Mr. Donohue not notify the other people? There are other minority shareholders, 60 percent of the company is owned by other people, including your client. I don't know that it bears on how the decision should come out here, but did he conceal this from everybody, from your standpoint? Or were there some people who got a cut? He left, no, everybody got shares except several shareholders got left behind. Mr. Dimick was one, Mr. Stenglein was another. Okay, that's a good answer. Thank you. Mr. Dimick was deprived of the opportunity to make an elective decision on when to sell those shares because he didn't know about it and he didn't have them. Amundsen addresses this point. I just don't see that Amundsen speaks to the situation where the transaction is compensable. Well, Amundsen doesn't. Your expert and everybody else's expert agrees that you can figure out the value of these shares and they agreed what that value was. Let me address that, Your Honor. The value of the shares on the date they were converted, in an effort to avoid speculation about when Mr. Dimick would have sold the shares, the Court imposed a remedy on Mr. Dimick that is impossible. And because those shares that Mr. Dimick was supposed to get when the transaction closed on January 30, 1996, were $10 a share, he would have received 42,000 shares for his 12 percent interest. He would have received $420,000 worth of shares that would have been subject to three transfer restrictions. They would have been 144 stock and they would have been restricted. But everybody valued those shares, including your expert, and they all agreed on what that value was. My client is being subjected to the burden of transfer restrictions and then the Court is saying, and then I'm going to say, you would have alienated them anyway. In other words, we have the restrictions but we don't get the benefit of them. They could not have been transacted and therefore this desire to have Is there anything in the record, I mean, are there legends such that they couldn't have been transacted or that they couldn't have been Yes, they could not have been transacted for, in the record, the agreement by which the shareholders, by which the assets were purchased says you're not going to get half these shares for two years. There was a holdback and that is in the record, the actual transaction. So what, and this is very standard in asset purchase deals is that you don't get the shares right away and so these shares could not have been sold for two years. And the evidence is Mr. Donohue didn't sell his shares. Transferred. They could not have been transferred. People don't buy and the accountants that testified said yes, you've got to dramatically reduce the value of what you wouldn't have received because you don't have it. And so Your own, one of the big problems, your own expert apparently testified to the value that the judge put on it. The expert testified Which is kind of hard to get around now and say now our own case was incorrect. The contractual right to receive the shares in two years and a date forward does not have the real value, but they would not have had the shares. You can't sell something you don't have. They also had But your own expert was wrong. No, the expert is valuing the expectancy of getting something in two years, not the sharehold shares that he doesn't have. Even if Amundsen doesn't address the situation, California law on conversion does because the rule there is that with stock that rises and falls in value and you are deprived of the opportunity to sell it because you don't know it's been converted, you get the elective choice to get the value of the shares at a time when you reasonably should have known, when you knew, when you had an opportunity to do something about it. The result of this case, to avoid speculation, is to award Mr. Dimmick a fraction of the damages that Mr. Donohue got for converting those very same shares. The law doesn't provide for that. It doesn't countenance telling a breaching fiduciary duty who converted 12 percent of a company that Mr. Dimmick had an entitlement to. Your penalty for that is you get all the appreciation of those shares you never should have taken, and you're going to benefit by that to the tune of the appreciation in those shares during the period of time that nobody could sell them, including you. There's no evidence in the record that anybody was able to transact any of these shares in violation of the 144 restrictions, the two-year holdback because they didn't have the shares, and then the liquidating trust that they held back even some of the last bit of shares at the end. Do we really want to send the message to the breaching fiduciary? And if we do, we're the only people doing it because the conversion cases across the nation where it's stock tell you you don't get to do that. You don't get to convert shares with your only risk being having to refund the money that they were worth on the day you took them. Otherwise, Mr. Donohue, with the clarity of hindsight, can know that the benefit of his breach of fiduciary duty is that he gets $700,000 more than he would have gotten had he not done so. There is simply no case that suggests that where stock has been converted and someone didn't know, or a majority director has breached his fiduciary duty and deprived a shareholder of the value of his stock and the stock itself, that the breaching fiduciary who's taken that and hasn't told the plaintiff. Think about it this way. The record shows that Mr. Donohue decided who got shares and didn't get shares and somewhere along the way he granted Mr. Dimmick fully vested shares and then changed his mind and decided to take them back in violation of law. Since Mr. Dimmick didn't know about it and Mr. Donohue had all this power, Mr. Donohue could just watch and see what the stock did and then decide whether he was going to give Mr. Dimmick the shares depending on what it did. If it goes up in value dramatically, Mr. Donohue keeps it and the only punishment he suffers is what they were worth when he took them. Otherwise, he can just give them back and say, gee, they went down, so here, take them back. That's not the way it works. And there's just, there's not one case cited by the appellees to support the conclusion that you're going to value them on the date that they were taken when he didn't know, couldn't mitigate, couldn't do anything to cover and buy shares and enjoy the rapid run-up. Can you imagine that what they would suggest is that you've got to call your stockbroker every couple of months to say, have you converted my shares? Do I still have them? Do I need to go buy other shares to cover? Well, I think we've got your point, and you're just kind of repeating the same argument. And so maybe you should reserve, since I understand it's a cross-appeal. Okay. I'll do that. Mr. Willis. Good morning, I guess, Your Honors. I'm Jeffrey Willis. I represent the appellee and cross-appellant Joseph Donohue. Let me start, Judge Reimer, by addressing your question as to whether or not there was anything in the record that would suggest that Mr. Dimmock's constructive interest, if you will, in the consideration paid for Polyscan Inc.'s assets could not have been transacted or alienated as of the date of the transaction, which was absolutely nothing in the record to suggest that. In fact, the testimony was uniform that that interest could be hypothecated, it could be sold, it could be transferred. The stock could not have been sold on the open market because of the restrictions, but that didn't mean that the value represented by the stock could not have been obtained through other means. So, yes, it was fully alienable. Mr. Cohen testified to that. Mr. Curry testified to that. And, in fact, the document itself established that. Judge Reed, if I can address your question about whether or not Mr. Donohue concealed anything from anybody, the minority shareholders or others, Mr. Donohue did not conceal anything from anybody at all. The transaction, the ETEC Polyscan Inc. transaction, which was the sale of the assets of Polyscan Inc., was transparent. It was reported in the financial press as well as the San Francisco Chronicle, among other journals. He didn't tell the plaintiff, though, did he? He did not tell the plaintiff. That is correct. He did not tell the plaintiff. But I believe that there's a difference between concealing something as opposed to being proactive and making a statement to the plaintiff in this instance. And I might add in that regard that Mr. Donohue did not, quote, wear a black hat in this. And, in fact, while Mr. Donohue may have been wrong in assuming that Mr. Dimmick had abandoned his interest or was not entitled to an interest in Polyscan Inc., it wasn't malevolent and it wasn't malicious. Now, the damages the judge used were based on the value of the stock at the time of the ETEC transaction. Isn't that right? That is correct. And so that isn't really the discount, this discount idea that even though the stock is locked up or subject to a holdback, the judge wasn't he just plain said it at the amount, the value and the date of the ETEC transaction. Well, I don't think that's entirely correct, Your Honor. And let me step back and see if I can't put that into context. The plaintiff sought a constructive trust over the ETEC shares as part of the relief in the lawsuit. That relief was not granted. The plaintiff also sought compensation, compensatory damages. That relief was granted. The value of the compensation was based upon the par value of the ETEC shares, which was the consideration for the Polyscan Inc. assets as of the date of the transaction. The par value was $10, but both experts for both sides testified that when you are looking at the value of the consideration as of the date of the transaction that ETEC paid for those assets, the par value of those shares had to be reduced by 40 percent due to the locked-up nature of the shares and the fact that they were subject to 1.4 restrictions. Did the judge reduce the discount on that basis? He accepted the experts' The judge said the value of these shares is $10, but the fact they're locked-up and they're subject to hold-backs are going to reduce this by 40 percent? By accepting both Mr. Curry's evaluation and Mr. Cohen's evaluation, he did, yes. Thank you. He did that. What I would like to talk about, though, is the judge's finding, unwavering finding, that Mr. Demick engaged in purely volitional conduct and turned his back on Mr. Donahue and his colleagues for six years without ever bothering to make reference or inquiry to anybody associated with PolyScan, either Inc. or Corp., until such time as he was contacted by lawyers from Mr. Goon's firm. Obviously, Judge Carney believed that that had some impact equitably on the relief that was available to Mr. Demick. It certainly impacted his decision that whether or not a constructive trust would be warranted. And while we don't have any quarrel with what Judge Carney did below in calculation of damages and in resolving the case, it's our position that the case never should have gotten to Judge Carney and that by his predecessor's failure to grant our motion for summary judgment based on the statute of limitations, and then Judge Carney's later failure to grant our judgment as a matter of law on the same issue, based upon not only the undisputed facts, but facts that are purely from admissions by Mr. Demick, that that was error which is reviewable by this Court on a de novo basis. And the facts are these. And I'm going to do my best not to overstate them because, again — I think we're very familiar with the facts. But doesn't the law regarding the nature of the fiduciary duty preclude some of your arguments on statute of limitations and laches and estoppel? Well, there's a distinction between statute of limitations and laches and estoppel, and let me — I'll address the latter two later. But going to the statute of limitations, I do not believe so, no. But there's a discovery rule, right? There is a discovery rule. My personal view is that the law is pretty much against you on that. Well, let me — let me take a shot at it, Judge Wartoff. I can't. I don't — yeah, fine. Well, again, the undisputed facts are these. Mr. Dimmock was, again, by his own volition, based on his own decision, decided — decided to turn his back on his former colleagues. The undisputed facts were that had he called any of his former colleagues and asked a question as simple as, how's it going, that he would have learned of either the ETEC transaction having occurred or he would have learned — But he told, don't call us, we'll call you? In the context of providing further engineering services, yes. He was told that by Mr. Dinnan, who was not a member of the control group, by the way. Go on with your answer. Okay. But had he picked up the phone and made a phone call, he would have learned of the ETEC transaction. But more importantly, and as I understand the law, the interest that Mr. Donohue was charged with protecting was Mr. Dimmock's interest in PolyScan Inc., which was at best a constructive interest, but that's what Judge Carney found. Mr. Dimmock had more than ample notice that that interest was not being protected, regardless of the ETEC transaction. Dimmock claims to have been promised a salary when he moved to Utah in May of 1994. He never received one. He claims to have been promised continuing medical benefits. Those were ended within two and a half months. I can understand all of those things having a good deal of value if your claim had to do with his employment. I have great difficulty understanding the relevance of that stuff on a shareholder, a right he's asserting as a shareholder. I never have been under the impression that as a shareholder of anything, of course I'm not, so it doesn't make any difference, but if in some other world I were a shareholder, I can't imagine having to call up the company and inquire about the status of my shares or its assets, either one, at the pain of losing a cause of action for conversion or breach of fiduciary duty. Well, there are other facts, Your Honor, that would impact that perception. The first is this was a close corporation. By Dimmock's own admission, run much more like a partnership than a corporation. It wasn't Standard Oil. Isn't there a pretty compelling argument that that just cuts the other way? That is, you know, his engineering services are no longer needed, so he splits and goes up to Utah. Doesn't that, if anything, mean that the company, with the fiduciary duty or the directors or the president, whoever has it, has even more of an obligation to make sure that the guy is posted with respect to the value or status of his shares? Well, yes, but I think that, again, it cuts both ways, but it comes back, because if, in fact, that was the expectation, that expectation was not met. In fact, it was dashed. I mean, Dimmock never asked for a share certificate. He never asked for anything in writing confirming his interest. Dimmock, by his own admission, thought that the company was destined to fail, and he didn't want to be stranded in Tucson. So, yes, while there may be more of an expectation on the fiduciary, here those advanced expectations were clearly not met, not even close to being satisfied. And there's one other fact, or actually two other facts in sequence. In the fall of 1995, Dimmock was contacted by a former colleague, again, not a member of the control group, who said, literally, the sky is falling. And, in fact, the roof of the facility had caved in, and the information departed to Mr. Dimmock was the company is in dire financial straits. We just had this horrible physical disaster, and just thought you'd want to know. At that point in time, Dimmock, by his own admission, didn't ask any further questions of this person or anybody else. He didn't call Mr. Donahue. He didn't call any of his friends that were at PolyScan to find out exactly what the extent is. So what? I mean, I understand how this can factor in to the prudence prong of the conversion measure of damages statute. And it did, sort of. But I just don't get how it gets you off the hook. Well, two reasons. One, the line of cases that we discussed that means of knowledge is knowledge if there's any duty at all to inquire. And, clearly, Mr. Dimmock had the means of knowledge. I guess that's the point I'm making here. Two, was there a duty to inquire? We believe there was. There was no case directly on point in California. There are cases from other jurisdictions that suggest strongly that there is when you are a substantial shareholder. Three, was he on notice that his interest was in jeopardy? That was my point in reciting to you the dash promises or expectations about his compensation and about his medical benefits that if Mr. Donahue wasn't willing to take care of those, then why in the world would Mr. Dimmock think that Mr. Donahue was interested in taking care of the other? What does interest have to do with stock ownership? I just don't understand. I mean, I got awfully excited when I found a stock certificate in my parents' drawer underneath a bunch of junk. I mean, you know, maybe it was worth $10, maybe it was worth $1,000, or maybe it was worthless. But they lost interest. I didn't even know it existed. But if you have ownership of a stock, you have it, whether you care about it or not, don't you? Well, yes, but there's an important distinction in this case, which is there was no stock certificate. You know what my point is. I just don't understand. I understand. I'm sorry. I understand your point, but let me just make this observation. His interest wasn't in a stock certificate. His interest was 12 percent ownership in the company. I understand that. Whether or not represented by a stock certificate, if he had been a partner with a 12 percent interest, he wouldn't have had a certificate. Would he have had a duty to inquire? Absolutely. Our suggestion is that in this context with a close corporation, and certainly when Mr. Dimmick is on notice that the company is in dire financial straits, it has had a natural disaster, and he never had any confidence in it anyway, that clearly Mr. Dimmick had a duty, however slight, to follow the track of his own investment. Now, we read the record to indicate that the damages were set on the value, which was based on what ETEC paid for the shares. We did not pick up on this idea that that was a discounted value. Is there something in the record showing that the judge actually discounted that value because of the holdup and lockup? Again, the record references would be the testimony of Mr. Curry and the testimony of Mr. Cohen. Well, does the judge say, I'm discounting that value that was set when the shares were exchanged, where the ETEC shares passed to Mr. Dimmick? No, he doesn't, because the value, and maybe this is the source of confusion, the value that the experts placed upon those shares as of the date of the transaction was derived using a discount off par value. The judge did not discount that figure further. He accepted their figure of the value. Wasn't it so much like $10 a share or something like that? Isn't that what ETEC paid for the Polyscan share, for the Polyscan assets? No. ETEC's compensation for the assets were the 350,000 shares, subject to 144 restrictions and subject to the lockup or holdback provisions of the agreement. That was their compensation. And I might suggest that one way to look at it is to say that Wasn't the value put on that at so much a share, the 350,000 shares? The value, the fair value or fair market value of that was what the experts derived, which was about Is that what the judge used, a fair market value of those shares? I believe the standard was either the fair value or the fair market value, but that was the figure that the judge used. That's correct. It was not the par value. No, it was not. Which, again, par value is an arbitrary figure. If I got it right, the shares' par value was $10. That's correct. The discount, they were worth $6. Correct. Demick shares, which he had 42,000 shares. That's what the judge found, correct. Times 6 was $252,000. That's correct. Plus interest. Right, 10% from that date. A total of $422,100. That's correct. Plus some costs. Yes. So he wound up with $431,000 plus change in total. That is correct. So just so I can get this discount idea, if you start out at $42,000, then you've got $420,000, is the discount back to $250,000? It's back to $252,000, that's correct.  Thank you. I would stress, Your Honor, that the par value is an arbitrary figure that's set by the corporation when the shares are issued. It doesn't reflect the market value of the share. What was the fair market value? Was it $252,000? The fair market value was $252,000. That's correct. Of the interest in the restricted shares. That's correct. Now, looking at this from the standpoint of a constructive trust, which says that a fiduciary cannot profit from the breach of that duty, then isn't there another way of looking at the damages here? Well, there's certainly a theory that's been promoted by the plaintiff, which I think is fallacious, and the reason for that is it goes back, again, to Judge Carney's determination that basically Mr. Demick, by his own volition, was an ostrich, and that has an effect in equity when weighing an appropriate compensation or an appropriate manner in which to compensate Mr. Demick. The argument has been made that there should be some disgorgement by Mr. Donohue because of later transactions that he made, but in fact because of Judge Carney's determination that Mr. Demick did nothing when he could have done something. Assume for a minute that he didn't know anything about all this stuff that was going on. He wouldn't have been able to do anything about it. Is that true? I believe that that sort of answers itself, yes. If he didn't know anything about it, what I'm suggesting is he easily could have known about all of it and didn't and chose voluntarily not to, and Judge Carney believed that that had a significant impact on the compensation that would be fairly due him. It also has an impact on the argument that there should be some disgorgement because what they seem to be saying is that Donohue profited by 12% because of Demick's exclusion. Well, he didn't. If you carry that argument out but apply it against the facts that have been found by Judge Carney, you have to use January 31st as the valuation date. As of the valuation date, Mr. Donohue's interest in the 40% interest in those shares was about $850,000. Twelve percent of that was less than $100,000, yet Judge Carney awarded Mr. Demick $252,000 plus interest. So the amount of the award to Mr. Demick exceeds the amount that Mr. Donohue may arguably have. The judge just arbitrarily picked the date of the conversion, the date of the ETEC deal as the valuation date, a date which the plaintiff didn't know anything about. And wouldn't it have been fairer to, let's say, pick a date when I realize you don't agree with these facts, but when he did find out about it? No, Your Honor. Rather than the date of conversion seems like an arbitrary date. It's not an arbitrary date. But, in fact, the statute specifically specifies that's presumptively the manner in which conversion damages are evaluated. And the statute 3. Well, the judge used the theory of speculation or the doctrine of speculation. That's correct. Now, what is that doctrine? Well, in essence, if you, if a party, an aggrieved party is entitled to damages and there's a manner in which to determine the damage award without engaging in speculation, that should be done over any method that would involve speculation. Speculation, as I read the theory, does not address the amount of damages, but whether the damages resulted from the breach. Is that right? I don't agree with that statement, no. All right. And, in fact, if you look at this. That's the research we did. That's what it showed. Tell me why that isn't right. In this instance, Your Honor, the one true figure we have, the one thing that we know is a fact, because both experts agreed upon it, was the value of the interest in those shares as of January 30th, 1996. Because of Mr. Dimmock's conduct, as well as the fact that to use any other date would be speculative, Judge Carney chose that date and compensated Mr. Dimmock for basically the time value of that, of those funds or that award by tacking on interest at 10%. Have you looked at the Myers case interpreting California Civil Code 3336? I'm sure I have, Your Honor. And, as I believe, that recognizes that the second prong of 3336 is only to be invoked if there's a manifest injustice. Here, there wouldn't be and wasn't a manifest injustice by restricting Mr. Dimmock to the date of the transaction, again, in large part because of his own sloth and his own favor and negligence. He says that the doctrine doesn't apply to the amount of profits, but whether the profits resulted from the breach. And I guess my point is, is that there are no profits to point to resulting from the breach. All that existed was — No, he sold the stock for $6 million. He sold — A fair amount of profit, I assume, built in there someplace. But, Your Honor, he could have sold that stock on the date of the transaction for $800,000. And Mr. Dimmock, the shares or the amount of the transaction to which Mr. Dimmock was found to be entitled, also could have been sold on the date of that transaction for $252,000. And who is to say that wouldn't have happened? Who is to say that Mr. Dimmock, had he participated, wouldn't still be holding on to the shares? Who is to say that Allied Materials might not go bankrupt? I mean, I think that's where the speculation comes from. Judge Reimer is going to get on your neck for installing my fault for you being over time. So I don't want to use more of your time. As long as you have a question, that's fine. I will be happy to answer any further questions. I'm finished. Okay. Thank you very much. Mr. Willis, Mr. Coon. A couple of the Court's questions I can answer. We asked the Court to take judicial notice of ETEC. It was not the par value. That was a publicly traded company. And it was $10 a share was the low price that the ETEC stock transacted on the day that the judge got it. Are you saying the fair market value was $10 a share? Correct. The low bid for ETEC on January. You're not saying the fair market value was. You're saying that's what showed up on the exchange. The fair market value, your expert agreed, was that minus a discount for the lockout. That is correct. Now, let me make a point. He said Mr. Dimmick could have sold the shares on that day. If he could have sold the shares on that day, he could have sold them for $10 a share because that's what ETEC shares were trading for that day. So the evidence is, and the judge did make findings on this, that he discounted them because those shares could not have been transacted. They could not have been sold. So he did not, to avoid speculation. But sometimes you can sell an interest in something that is not readily saleable at that time. That's the way I read the discount that's argued for here. You start out with the value at $10 a share, and then you say, but you can't sell it. But somebody is willing to pay 60% of that or 40% of that and say, I'll look at the future, and so that would fix the fair market value. Is that right? Fair market value of the interest that you could not see. An interest in, I think what they're trying to do is value a promise to you to sell them when I can sell them. In other words, like a promissory note or something where you don't have the money, but you're willing to pay. I'm willing to pay. I won't pay the full value, but I'll pay you something less than that because I think the stock will be worth something down the pike, so I'll go on that basis. Is that right? Of course, Mr. Dimmick would have had to, if he was invited into this transaction or given the opportunity to participate that his shares entitled him to, he had to sign an agreement agreeing not to do that. So I guess, yeah, he could have breached his agreement and sold them to somebody on one of those underhanded, I'm selling unregistered securities in violation of federal security law, Rule 144. I'm breaching my contract, and by the way, I don't have the shares, but when I get them, I'm going to give them to you. If he went through all those machinations, in theory, you can sell anything. I mean, in theory, you can sell illegal drugs, too. But this sale that the judge essentially imposed of Mr. Dimmick's interest would have violated both the law and the agreements that Mr. Dimmick and all the other shareholders would have signed. I'm not much taken with Mr. Willis's effort to get out of this problem altogether, on the footing of lack of interest and whatever. I've got to say, it's pretty remarkable that a guy who didn't even have shares in the — which one? I'm getting these mixed up. Polyscan, Inc.? Then is squawking about the sale of assets to E-Tech. I mean, I think he's lucky he got anything, let alone what he did get, because he knew he didn't have a stock certificate for Polyscan. And so, I mean, I don't even know how you can show a connection. So you showed it somehow, and the judge bought it. And I certainly think that Mr. Dimmick ought to be saying, bless you, Judge. Well, let me — let me try to address the Court's concern. In the record, there's the transaction where Polyscan Corporation, that Mr. Dimmick had his 12 percent interest, was converted to Polyscan, Inc. It is a transaction between Mr. Donohue on the one side and Mr. Donohue and two other directors of Polyscan Corp. on the other. Yes. They transferred all the assets. He wasn't listed as a shareholder. Oh, no, no. He was a shareholder of Polyscan Corp. In the record, the income tax returns are put in where Mr. Dimmick is listed as a 12 percent shareholder of Polyscan Corp. In California, for a corporation to sell all or substantially all of its assets, you need — you need the approval of more — the shareholders. There was no shareholder vote here. Mr. Dimmick, under California law, as a 12 percent shareholder, could have kept that asset sale from happening. California protects minority shareholders who have more than 10 percent interest. And he didn't. He didn't get notice of it. There was no shareholder vote. There was no notice to shareholders. Now, there was something else that Mr. Donohue did. Mr. Willis argues there was no concealment here. In the record, ER-270 is the certificate of election to wind up and dissolve a Polyscan Corp. The corporation Dimmick admittedly had a 12 percent interest in. Filed January 29, 1996, with the Secretary of State, where Mr. Donohue, under penalty of perjury, certified Polyscan Corp. never had any shareholders. Therefore, the Board of Directors can wind up and dissolve this corporation without any notice to the shareholders. This was required by E-Tech as a condition proceeding to close and therefore was filed the day before that transaction closed. There were shareholders of Polyscan Corp., and Mr. Dimmick was one of them. He was required to receive statutory notice both of the sale and the windup of Polyscan Corp., and Mr. Donohue decided under penalty of perjury to misrepresent the shareholder status so that Mr. Dimmick wouldn't find out. And as a consequence of that false document, he was able to dissolve Polyscan Corp. and keep Mr. Dimmick in the dark, and for that, he profited immensely because Mr. Donohue did honor the restrictions on the transfer and was forced to hold his shares, including the portion that he got from Mr. Dimmick, in violation of Mr. Dimmick's rights, at exponentially higher values. Donohue got the choice when to sell his shares. Mr. Dimmick did not. Under those circumstances, Mr. Donohue profited from the good judgment to honor the contractual and legal district. Kennedy Fit in the constructive trust argument, where would it fit in here? If you can trace the 12 percent interest that Donohue received, the 12 percent bump in his shareholders' Were you entitled to the date Donohue sold it? Is that the proper date if there were a credit? Well, Donohue sold his shares off in blocks. And so if you use the average selling price that's in the record that Mr. Donohue transacted for, Mr. Donohue received approximately six million dollars for his 40 percent interest, which included a 12 percent bump of what it would have been for Mr. Dimmock. So if you take 12 percent of what Mr. Donohue received for his shares So the proper date would be the actual date that Donohue sold them or an average of those dates? Right. If you apply a constructive trust theory? Correct. And that gets you to Mr. Donohue profiting, receiving for Mr. Dimmock's 12 percent interest, for his Mr. Donohue's 40 percent of Mr. Dimmock's 12 percent interest, $700,000. So Mr. Donohue, even with the interest and everything else, is coming out significantly ahead of what he would have gotten had he not breached his fiduciary duty, filed the false certificate, keeping Mr. Dimmock in the dark. How does disgorgement fit with constructive trust? I think it's two ways to get at the same thing, which is essentially he doesn't get to keep the benefit of having breached. And here he clearly benefited. And Mr. Dimmock may have made a worse choice than Donohue or a better choice in terms of when he sold, but we'll never know because Mr. Dimmock never got the chance. And in those circumstances, the cases are uniform across the country, that the shareholder gets more than simply forced out of his shares on a date when he doesn't know about it. Okay. Anything else? All right. Thank you. Thank you. Let me thank the counsel. The matter has been argued. The case is submitted. And the court will stand as it does for the day.
judges: Rymer, Wardlaw, Reed